**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NATHANIEL J. JOHNSON,** <br> **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **PHILADELPHIA HOUSING** <br> **AUTHORITY,** <br> **Defendant.** | **NO.  15-2343** |

## MEMORANDUM OPINION

Plaintiff Nathaniel Johnson brings this employment discrimination case against his former employer, Defendant Philadelphia Housing Authority, alleging disparate treatment, retaliation, and a hostile work environment based on his age and race in violation of Title VII of the Civil Rights Act of 1968 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 *et seq.*  Defendant has filed a motion for summary judgment on all of Plaintiff's claims.  The motion shall be granted in part and denied in part.

## I.    BACKGROUND

### A.   Plaintiff's Employment with the PHA

Plaintiff was hired as a painter by the Philadelphia Housing Authority ("PHA") in 1998. J.A. 61.  He worked without incident under a number of supervisors during his first 16 years at PHA until mid-2014, when he began working under Painting Superintendent Richard Andrews ("Andrews").  J.A. 93.  By that time, Defendant employed between 50 and 75 painters.  J.A. 395.

Almost immediately upon Andrews becoming Plaintiff's supervisor, Plaintiff and Andrews engaged in a series of conflicts over work assignments, transportation, and record keeping.  J.A. 114-28.  Plaintiff and Andrews' central point of contention was Plaintiff's

completion of time sheets.  J.A. 117.  Plaintiff described Andrews as "fussy" about paperwork, and contends that he often interrupted Plaintiff's job tasks with administrative concerns in a manner that Plaintiff described as "mean" and "downright nasty."  J.A. 117, 141.  Plaintiff believes that Andrews assigned him to less desirable job tasks, often with inferior equipment and inadequate assistance.  J.A. 146.  For example, Plaintiff claims that he was assigned to PHA's "raggediest" truck while other painters drove newer vehicles.  J.A. 258.  He also testified that he was frequently assigned to large tasks with inexperienced or apprentice workers to assist him, while other painters were allowed to work in teams of more experienced workers assigned to more manageable tasks.  J.A. 146.  On one specific occasion in August 2014, Plaintiff recalls being assigned to go to a job site with a younger worker who, through miscommunication, accidently stranded Plaintiff with no equipment or vehicle.  J.A. 162.  Plaintiff alleges that Andrews ignored his phone calls reporting the situation, and Plaintiff was eventually forced to take a taxi back to the Abbottsford Homes – which served as the painters' base office – and then received an oral reprimand for returning late from lunch.  J.A. 107, 150.

Plaintiff believes that Andrews' treatment of him was motivated by Plaintiff's race and age.  Plaintiff, who is African-American, turned 52 years old during the time he worked under Andrews.  J.A. 46.  During this six month period, Plaintiff claims that Andrews, who was 66 years old at the time, would frequently reference Plaintiff's age in association with questions like "Why did you even come in today?"  J.A. 112, 731.  Plaintiff also alleged that he was told that younger workers could do the work "better and faster," that he had "been on the job too long," and that "maybe it's time for you to move on."  J.A. 331-32.  Plaintiff further testified that Andrews, who is also African-American, used a racial epithet in referring to him on more than one occasion.  J.A. 92, 112.  Although Plaintiff believes that Andrews' treatment was motivated

by race and age, he also indicated that he believed that Andrews was personally biased against him.  J.A. 220. For example, he testified that Andrews, "didn't like me," and that often "it seemed like his focus was just to mess up my day."  J.A. 117, 220.  Plaintiff specifically recalled that Andrews did not treat any other workers the way he treated Plaintiff.  J.A. 118.

Plaintiff cited two younger white painters who he believes were treated more favorably, but he was unable to cite specific examples of more favorable treatment.  He claimed that the two – Bill McCool and General Simons – were given better work assignments, though he could not provide specific examples of these assignments.  J.A. 256.  He also claimed that another younger white worker, Ed Cadowski, was given better equipment, which he identified as a "new" truck.  J.A. 258.  Plaintiff has also alleged that he was expected to train a younger worker, Maurice Green ("Green"), to replace him.  J.A. 281.  Green, who was 21 years old at the time, was one of several apprentices assigned to work with Plaintiff.  J.A. 448.  He remained employed by PHA after Plaintiff was terminated, but was himself terminated a few months later while still working as an apprentice.  J.A. 100-01, 448. [1]

Plaintiff claims that he attempted to report allegations of workplace bullying and discrimination to PHA, and in particular to Senior Labor and Employment Specialist Stacey Thomas ("Thomas") via telephone on a number of occasions in both June and August 2014, but was ignored.  J.A. 163, 269.  Thomas denies speaking with Plaintiff about his conflict with Andrews, and recalls that her only conversations with Plaintiff concerned his return from a work-related injury in June 2014.  J.A. 733.  Defendant's files do not contain the record of any complaints by Plaintiff against Andrews.  J.A. 431.

---

[1] Plaintiff alleged in the TAC that Green was 17 years old, but during his deposition, he testified that he did not know Green's age.  J.A. 311.  He also admitted that he did not know whether Green actually replaced him.  J.A. 265.

### B.   October 23, 2014 Incident

Plaintiff and Andrews' simmering conflict erupted into a major incident at the Abbottsford Homes on October 23, 2014.  At the beginning of Plaintiff's shift, he was presented with a disciplinary notice regarding an oral reprimand for excessive lateness on several previous occasions.  J.A. 170.  It is undisputed that a confrontation ensued, but Plaintiff and Andrews have offered divergent accounts of the incident, with each accusing the other of being the aggressor.

According to Plaintiff's account, after he refused to sign the reprimand, he went into another room.  J.A. 185.  Andrews followed him, called him a "black n----r," and demanded that he sign the paperwork.  J.A. 185.  Plaintiff then asked Andrews to "stop talking to [him] as if he were a child," after Andrews approached him and stood "eye to eye" with him.  J.A. 217, 737.  Plaintiff denies putting his finger in Andrews' face or touching Andrews.  J.A. 217.  By this point, several co-workers had gathered around, and two of them – Tazhay McJetters ("McJetters") and William Santee ("Santee") – separated Plaintiff and Andrews.  J.A. 219.  Plaintiff denies that McJetters and Santee had to forcibly push him away from Andrews; instead, he describes their actions as "hugging" him and walking with him calmly away from the confrontation.  J.A. 219, 220.

Andrews reported a starkly different version of the incident.  He recalls that he went to find Plaintiff after hearing from Plaintiff's foreman Thomas Caraballo ("Caraballo") that Plaintiff had failed to properly complete his "trip sheets" to record job tasks from a prior day.  J.A. 737.  When Andrews found Plaintiff, he informed him that he needed to complete his trip sheets to get paid.  J.A. 737.  Plaintiff replied, "Don't say a fucking thing to me!" and then began to call Andrews "derogatory" names.  J.A. 737.  Plaintiff then approached Andrews, "chest

4

bumped" him, "pointed his finger" in Andrews' face, and stated "You don't know who I am!  I will fuck you up!"  J.A. 737.  At that point, Andrews recalls that McJetters and Santee restrained Plaintiff and pushed him away from the altercation.  J.A. 737.

### C.  Investigation and Termination

Andrews reported the incident to PHA's Department of Human Resources, which initiated an investigation conducted by Thomas.  Plaintiff was immediately suspended pending the outcome of the investigation.  J.A. 740.  In the course of the investigation, Thomas interviewed Plaintiff, Andrews, McJetters, Santee, and Caraballo.  J.A. 737-38.  She also reviewed police surveillance footage which captured a portion of the incident.  J.A. 739.

All three third-party witnesses to the altercation reported a similar sequence of events.  Santee recalled that he had seen Andrews and Plaintiff arguing with each other and stepped in to separate them.  J.A. 737.  He then pushed Plaintiff away from Andrews with the help of other painters.  J.A. 737.   Similarly, McJetters recalled seeing Plaintiff and Andrews arguing.  J.A. 737.  He did not see Plaintiff touch Andrews, but nevertheless stepped in with Santee to push Plaintiff away from the situation.  J.A. 737.  He recalled that Plaintiff resisted forcefully, and that he had to pick Plaintiff "up off of his feet" in order to restrain him.  J.A. 737.  Caraballo did not witness the actual altercation, but when he arrived on the scene, he saw McJetters and Santee restraining Plaintiff.  J.A. 737.

The video footage did not conclusively resolve what happened, but Thomas found that it supported the conclusion that Plaintiff was the aggressor.  Thomas could not determine from the footage whether Plaintiff touched Andrews, but she believed that the footage showed him advancing very close toward Andrews, and Andrews taking a step backwards.  J.A. 739.

In reconciling the testimony of the eyewitnesses and the video footage, Thomas concluded that Andrews' accusation of chest bumping and finger pointing was unsubstantiated, but that Plaintiff had nevertheless violated PHA's Workplace Violence policy by advancing aggressively toward Andrews in a threatening manner.  J.A. 739.  In reaching this conclusion, Thomas placed great weight in the testimony of McJetters and Santee who recalled forcefully restraining Plaintiff.  J.A. 739.  In light of their consistent accounts, she concluded that Plaintiff's confrontation of Andrews was "violent, abusive, or threatening behavior" and thus violated PHA's Workplace Violence Policy, even if it stopped short of physical contact.  J.A. 739.

Thomas submitted the report of her investigation to Vice President of Human Resources Joanne Strauss ("Strauss"), who made the decision to terminate Plaintiff.  J.A. 400.  Strauss, who has never met Andrews, relied entirely on Thomas's conclusion and did not conduct an investigation or review the video footage herself.  J.A. 368, 420.  On December 1, 2014, she issued Plaintiff a Letter of Termination citing a violation of PHA's policy against "Class IV Conduct:  Engaging in or exhibiting violent or threatening behavior."  J.A. 741.

## II.   LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'"  *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

6

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  Material facts are those which "might affect the outcome of the suit under the governing substantive law." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  In deciding a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*).  In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).  In making this showing of a genuine dispute, "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016).

## III.    DISCUSSION

Plaintiff has advanced three theories of discrimination.  First, he has alleged that his termination constituted disparate treatment based on race and age.  Second, he has claimed that both his termination and Andrews' alleged harassment of him were retaliation for his

discrimination complaints against Andrews. Third, he argues that Andrews' treatment of him created a hostile work environment motivated by race and age.

## A. Disparate Treatment

Disparate treatment claims that are, like Plaintiff's, based on indirect evidence of discrimination are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (applying *McDonnell Douglas* framework to ADEA claims); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (applying *McDonnell Douglas* framework to Title VII race discrimination claims); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (holding that PHRA is generally interpreted in accord with analogous federal law). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Willis*, 808 F.3d at 644. If a *prima facie* case is established, the burden of production shifts to the defendant to present a legitimate, non-discriminatory reason for its actions. *Id.* If such a reason is proffered, the burden shifts back to the plaintiff to demonstrate "that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Id.*

### 1. Race Discrimination

#### a. *Prima facie* case

To establish a *prima facie* case of race discrimination under Title VII or the PHRA, a plaintiff must show that he: (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and, (4) the circumstances of the adverse employment action imply discrimination. *Jones*, 198 F.3d at 410-11 (3d Cir. 1999).[2]

---

[2] The Third Circuit has held that the PHRA is analyzed in accord with analogous federal discrimination law. *See Kelly*, 94 F.3d at 105.

In this case, the first three elements of Plaintiff's *prima facie* case are not disputed:  he

was African-American, he was qualified for his position, and his suspension and ultimate

termination were adverse employment actions.[3]  Defendant argues, however, that Plaintiff has

not offered sufficient evidence to support the fourth element: an inference of discrimination with

respect to the adverse actions.  The most straightforward method for demonstrating an inference

of discrimination is to show that "similarly situated" employees who were not in a protected

class were treated more favorably.  *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170

(3d Cir. 2013).  It is also possible to establish a *prima facie* case without specific comparators,

but to do so a plaintiff must provide other evidence to "establish some causal nexus between his

membership in a protected class and the [adverse action.]"  *Sarullo v. U.S. Postal Serv.*, 352 F.3d

789, 798 (3d Cir. 2003).  The "central focus" of this fourth element "is always whether the

employer is treating some people less favorably than others because of their race, color, religion,

sex, or national origin."  *Id*. (internal quotation marks omitted).

Plaintiff has not identified comparators or any other evidence to support the inference

that his suspension and termination were based on race.  With respect to comparators, the record

does not reveal any employees similarly situated to Plaintiff (*i.e.*, employees accused of

aggressively confronting a supervisor) who were given a more lenient consequence.  Turning to

other evidence of discrimination, Plaintiff contends that Andrews demonstrated racial bias

against him through racial slurs and generally treating him less favorably than white employees.

---

[3] Plaintiff has also alleged that he was given inferior assignments and equipment, and was "excessively supervised" by Andrews.  However, in the context of a disparate treatment claim, adverse employment actions are only those which effect "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-54 (3d Cir. 1999) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  Since Plaintiff has not identified any significant change in his employment status directly arising from Andrews' alleged mistreatment of him, these allegations do not constitute actionable adverse actions, and Plaintiff's disparate treatment claims are limited to his suspension and ultimate termination.

But Andrews was not involved in the decision to fire Plaintiff – that decision was made by Strauss based on Thomas's investigation.  While remarks or the conduct of non-decisionmakers may sometimes provide "evidence of the atmosphere in which the employment decision was carried out," such evidence standing alone is "inadequate to support an inference of discrimination."  *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997).  Evidence of Andrews' bias is particularly inadequate to support an inference of discrimination here, since Strauss made her decision based on Thomas's comprehensive report and did not contact any of the parties involved in the incident.  Indeed, Strauss works in a different location than Plaintiff and Andrews, and she has never met Andrews, so there is no basis for concluding that Andrews' alleged personal animus toward Plaintiff was reflective of the atmosphere in which Strauss made her decision.

Plaintiff argues that even though Andrews did not participate directly in the decision to fire him, the fact that the investigation occurred in response to Andrews' allegedly biased report to Thomas supports a discrimination claim under the "cat's paw" theory of liability endorsed in *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011); *see McKenna v. City of Phila.*, 649 F.3d 171, 177-79 (3d Cir. 2011) (applying cat's paw analysis from *Staub* to a Title VII claim).  The cat's paw theory described in *Staub*, however, requires that the non-decisionmaker's discriminatory act be the "proximate cause of the ultimate employment action."  *Staub*, 562 U.S. at 422.  As the Third Circuit has noted, "proximate cause will not exist when the employer does not rely on the supervisor's biased report in taking the ultimate adverse action."  *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 331 (3d Cir. 2015) (internal quotation marks omitted).  In *Jones*, the allegedly discriminatory act consisted of a supervisor's initial report of timesheet fraud.  *Id.* The Third Circuit rejected cat's paw liability because the ultimate decision to fire the plaintiff

was the result of an independent investigation and the allegedly discriminatory report merely "got the ball rolling" on that investigation. *Id.*

Andrews' actions here did not serve as the proximate cause of Plaintiff's termination. Andrews' report that Plaintiff hit him served only to initiate an investigation. In reconciling the testimony gathered during that investigation, Thomas discounted Andrews' allegations and based her conclusion that Plaintiff violated the Workplace Violence Policy on consistent reports from all third-party witnesses that Plaintiff advanced toward Andrews and had to be forcefully restrained. Since Andrews' actions served only to spark an investigation, just as the initial report in *Jones*, and the ultimate decision based on that investigation did not rely on Andrews' report, the cat's paw theory of liability does not apply, and Plaintiff has failed to make out a *prima facie* case of race discrimination.

### b. Legitimate non-discriminatory reason

Even if Plaintiff could make out a *prima facie* case of discrimination, Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination: a "Class IV" violation of the Workplace Violence Policy. This decision was made by Strauss after reviewing Thomas's report of an investigation. Strauss agreed that Plaintiff had violated the Workplace Violence Policy and determined that the violation warranted terminating Plaintiff's employment.

### c. Pretext

To prevent summary judgment when the defendant has responded with a legitimate, non-discriminatory reason for its action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v.*

*Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  When a plaintiff offers no affirmative evidence of discrimination but instead attempts to show pretext by demonstrating the weakness of an employer's proffered reasons, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action."  *Id.* (internal citations omitted).  It is not enough for a plaintiff to "simply show that the employer's decision was wrong or mistaken," but instead the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Id.* (internal quotation marks and citations omitted).

Plaintiff contends that Defendant's stated reason for firing him is pretextual because he did not physically assault Andrews.  But this argument is a red herring:  Plaintiff was not fired for touching Andrews.  Indeed, Thomas concluded that Andrews' allegation about physical contact was unfounded, so whether Plaintiff actually hit Andrews is neither disputed nor material to the question of whether Defendant's proffered reason for firing Plaintiff was pretextual.

Turning to whether the investigation itself was so flawed as to suggest pretext, the record shows that Thomas conducted a thorough inquiry, including a review of the surveillance video footage of the incident as well as interviews with Plaintiff, Defendant, the two co-workers who restrained Plaintiff, and Plaintiff's foreman.  Although Plaintiff's account of the events leading up to the altercation differs from Andrews' version, all witnesses, including Plaintiff, agree that there was a confrontation and that Plaintiff was physically separated from Andrews.  Disputes

12

over the precise details of the altercation, such as whether Plaintiff was "restrained" (as

Andrews, McJetters, and Santee recalled) or "hugged" (as Plaintiff recalled), do not suggest that

the investigation was pretextual.  Regardless of whether Thomas and Strauss are correct about

what happened during the altercation, the record leaves no question that Strauss's decision was

based on Thomas's report, which was, in turn based on her investigation and well-reasoned

reconciliation of the video footage and witness testimony concerning the incident.[4]  Since

Plaintiff has not identified an inconsistency, contradiction, or other weakness in Defendant's

investigation of the altercation, he has failed to provide evidence that would allow a reasonable

factfinder to conclude that Defendant's proffered basis for firing him was pretextual.

Defendant's motion for summary judgment shall therefore be granted with respect to Plaintiff's

disparate impact race discrimination claims.

### 2.  Age Discrimination

To establish a *prima facie* case of age discrimination, a plaintiff must show that: "(1) the

plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3)

the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately

replaced by another employee who was sufficiently younger so as to support an inference of a

discriminatory motive."  *Willis*, 808 F.3d at 644.  When a plaintiff is not directly replaced, the

fourth element can be satisfied if a plaintiff points to facts relating to the adverse action that, "if

otherwise unexplained, are more likely than not based on the consideration of impermissible

factors."  *Id.*

---

[4] Plaintiff has objected to Defendant's failure to submit the actual video footage of the incident to the Court for review at this juncture.  However, even if the video – which is, by all accounts, ambiguous – reveals additional factual disputes concerning the altercation, those disputes would not create a genuine dispute of material fact because, as noted above, the decision to fire Plaintiff was based on the testimony that an altercation occurred and that Plaintiff was forcefully restrained.  Furthermore, Strauss, the ultimate decisionmaker, did not view the video herself.

Only the fourth element of the *prima facie* case is disputed at this juncture, since the parties agree that Plaintiff was at least forty years old, that his suspension and termination were adverse employment actions, and that he was qualified for his position.  Turning to the fourth element, Defendant argues that Plaintiff has not identified any younger employees who were treated more favorably, nor has he shown that he was replaced by a younger employee.  Plaintiff, on the other hand, argues that he was regularly given less favorable work assignments due to his age, that age-related derogatory comments were often directed at him, and that he was forced to "prepare" a much younger employee – his apprentice Green – to replace him.

Plaintiff's allegations of less favorable work assignments and age-related comments by Andrews fail to establish an inference of age discrimination for the same reason that similar allegations fail to establish an inference of race discrimination:  Andrews did not make the decision to fire Plaintiff.  Strauss made the decision, based on Thomas's investigation, and therefore any age-related animus that Andrews or others at the job site harbored toward Plaintiff does not logically support an inference that the termination was motivated by Plaintiff's age.[5]

In addition to failing to connect Andrews' alleged animus to the decision to fire Plaintiff, Plaintiff has failed to provide evidentiary support for his contention that he was replaced by Green.  While it is undisputed that Plaintiff was expected to provide Green with guidance, there is no evidence that Green replaced Plaintiff.  Green was a participant in an apprenticeship program available to residents of PHA housing, and Plaintiff had been the mentor to several apprentices before Green.  The fact that Green continued to work as an apprentice – a lower-grade position than Plaintiff's – after Plaintiff was terminated does not show that Green "replaced" Plaintiff's position among the 50-75 painters employed by Defendant at the time.

---

[5] As discussed in the context of Plaintiff's race discrimination claim the cat's paw theory of liability advanced by Plaintiff does not apply here because Andrews' report that Plaintiff hit him served only to initiate Thomas's investigation, and she did not rely on Andrews' version of events in making her conclusions and recommendation.

Indeed, Plaintiff himself admitted that he did not know if Green replaced him.  In sum, Plaintiff has failed to identify younger workers who were treated more favorably by Strauss or Thomas, nor has he has provided evidence that allows a reasonable conclusion that he was replaced by Green (or any other younger worker).  He has thus failed to make out a *prima facie* case of age discrimination.

Even if Plaintiff could make out a *prima facie* case of age discrimination, Defendant has proffered a legitimate non-discriminatory reason for his termination – a violation of the Workplace Violence Policy – and for the same reasons as described in the context of his race discrimination claim, Plaintiff has not come forth with evidence to show that this reason was pretextual.  Defendant's motion for summary judgment shall therefore be granted with respect to Plaintiff's disparate impact age discrimination claims.

### B.   Retaliation

Like disparate impact claims, retaliation claims under Title VII, the ADEA, and the PHRA that rely on indirect evidence of retaliation are analyzed under the *McDonnell Douglas* framework.  *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (applying the *McDonnell Douglas* framework to Title VII, ADEA, and PHRA retaliation claims).

#### 1.   *Prima Facie* Case

To establish a *prima facie* case of retaliation under either Title VII, the ADEA, or the PHRA, a plaintiff must show: "(1) [that he engaged in] protected employee activity; (2) [an] adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *Daniels,* 776 F.3d at 193 (internal quotation marks omitted).

### a.   Protected Activity

Protected employment activity consists not only of formal charges of discrimination, but also "informal protests of discriminatory employment practices, including making complaints to management." *Daniels*, 776 F.3d at 193.  Such a complaint is only protected activity, however, if it specifically alleges "discrimination based on a protected category, such as age or race." *Id.* While a plaintiff need not prove that the alleged activity was unlawful discrimination, he must show that he had "an objectively reasonable belief that the activity [he] opposed constituted unlawful discrimination under the relevant statute." *Id.* at 193-94.

Plaintiff has testified that he called Defendant's Human Resources Department numerous times in June and August 2014 to complain about race and age discrimination perpetrated against him by Andrews.  Thomas has acknowledged speaking with Plaintiff in June 2014, but recalls only discussions about Plaintiff's return from a work-related injury, and Defendant has no record of a complaint about Andrews' conduct.  Since the only two witnesses to Plaintiff's communications with Thomas are Thomas and Plaintiff, and they have offered divergent accounts of these conversations, there is a genuine issue of material fact as to whether Plaintiff complained of discrimination by Andrews.  Resolving this dispute in Plaintiff's favor would provide a factfinder with a reasonable basis for concluding that Plaintiff complained to management of unlawful age and race discrimination and thus engaged in protected activity under Title VII, the ADEA, and the PHRA.

### b.   Adverse Action

The standard for an adverse action in the retaliation context is more relaxed than in the context of disparate impact claims.  To support a retaliation claim, a plaintiff need not demonstrate a significant change in employment status, but rather may point to an action that

"'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe Fy. Co. v. White*, 548 U.S. 53, 58 (2006)). According to Plaintiff, Andrews frequently subjected him to racial and age-related slurs, issued him inferior equipment, and assigned him to undesirable job tasks. Although Plaintiff's vague account is the only evidence of this activity, Defendant has neither disputed Plaintiff's testimony nor offered evidence that the alleged actions never occurred. Crediting Plaintiff testimony, a factfinder could conclude that these actions would dissuade a reasonable worker from pursuing a charge of discrimination. Accordingly, Plaintiff has met his *prima facie* burden to show that both his termination and also Andrews' alleged harassment of him were adverse actions for the purposes of his retaliation claims.

### c.   Causal Connection

#### i.  Andrews' Alleged Harassment

Plaintiff has fallen short of drawing a causal connection between his alleged complaint of discrimination and Andrews' conduct for a fundamental reason: There is no evidence that Andrews knew about the complaints. Strauss and Thomas do not recall the complaints in the first place, let alone any communication with Andrews about the complaints. And Plaintiff does not claim to have told Andrews about them. Therefore, none of the individuals who would have had knowledge of Plaintiff's purported complaints told Andrews about them, so there is no reasonable basis for concluding that Andrews was aware of them. Since Andrews' actions could not have been motivated by retaliation for a complaint that he did not know about, Plaintiff has failed to make out a *prima facie* case of retaliation arising from Andrews' conduct.

### ii. Plaintiff's Termination

Plaintiff's argument that his termination was in retaliation for his complaint relies on the temporal proximity between the complaints and his termination.  The Third Circuit has recognized that an "unusually suggestive proximity in time between the protected activity and the adverse action" may support a causal inference.  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 301 (3d Cir. 2007) (internal quotation marks omitted).  The timing between Plaintiff's complaint and his termination, however, was not unusually suggestive.  Although he has alleged that he continued to complain about Andrews throughout 2014, the only specific timeframe he offered for his complaints was June 2014 and again after he received an oral reprimand on August 22 of that year.[6]  Thomas's investigation did not occur until late October – more than two months later.  This is far beyond the timeframe generally recognized as "unusually suggestive."  *See, e.g.*, *Motto v. Wal-Mart Stores East, LP*, 563 F. App'x 160, 164 (3d Cir. 2014) ("[W]e do not find the eleven-day period unusually suggestive of retaliation.").  Since Plaintiff has not established that he complained about Andrews any later than August, he cannot rely on temporal proximity to establish a causal connection between his complaints and his termination.  Therefore, even accepting Plaintiff's uncorroborated account that he complained to Thomas about Andrews, he has failed to show a causal connection between those complaints and his termination.  His *prima facie* case of retaliation arising from his termination thus falls short and Defendant's motion for summary judgment shall be granted with respect to Plaintiff's retaliation claims.

---

[6] Plaintiff indicated during his deposition that he has phone records to prove that he called Thomas during these time periods, J.A. 163, but those records were not included in the evidence submitted to the Court.

### C.   Hostile Work Environment[7]

In addition to his discrimination and retaliation claims, Plaintiff also alleges that

Andrews' treatment of him created a hostile work environment based on his age and race.  To

prevail on a hostile work environment claim, a plaintiff must establish that "(1) he suffered

intentional discrimination because of his race [or age]; (2) the discrimination was pervasive and

regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable

person of the same protected class in his position; and (5) there is a basis for vicarious liability."

*Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (internal quotation marks omitted).[8]

To determine whether conduct is sufficiently hostile to support a claim, a court must consider the

totality of the circumstances, which "may include the frequency of the discriminatory conduct;

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance."  *Id.* at 263

(internal quotation marks omitted).  However, "'offhanded comments, and isolated incidents

---

[7] During the hearing concerning Plaintiff's failure to timely respond to Defendant's motion for summary judgment, counsel for Plaintiff indicated that this case did not include claims for a hostile work environment.  In his subsequently filed brief, however, Plaintiff argues that the record supports a hostile work environment claim.  *See* Pl's. Br. at 28.  The reversal of his position continues a disturbing trend of ambiguous and untimely presentation of the issues that began at the pleading stage – which required three amendments and numerous extensions of deadlines – and continued through the briefing of the current motion.  But given that Plaintiff's statement that there was no hostile work environment claim was made in response to the Court's extemporaneous questioning at a hearing that was not focused on the merits of the case, and that Defendant had already submitted briefing on the hostile work environment issue in its original motion papers, the Court finds that no prejudice will result from disregarding Plaintiff's statement that he was not pursuing a hostile work environment claim and proceeding based on the positions presented in Plaintiff's written submissions.

[8] The Third Circuit has not yet decided if the ADEA supports hostile work environment claims.  *See Slater v. Susquehanna Cnty.*, 465 F. App'x 132, 138 (3d Cir. 2012) ("We assume, without deciding, that the ADEA makes available a hostile work environment claim for age-based discrimination, analyzed under the same standards as a Title VII hostile work environment claim.").  Several other circuits, however, have explicitly recognized hostile work environment claims under the ADEA.  *See Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011); *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (9th Cir. 1999); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996).  In finding that the ADEA supports hostile work environment claims, the Fifth and Sixth Circuits reasoned that "'the broad application of the hostile-environment doctrine in the Title VII context; the general similarity of purpose shared by Title VII and the ADEA; and the fact that the Title VII rationale for the doctrine is of equal force'" all point toward recognizing ADEA-based hostile work environment claims.  *Dediol*, 655 F.3d at 441 (quoting *Crawford*, 96 F.3d at 834).  This rationale is sound, and the Court predicts that the Third Circuit would reach the same conclusion and that, as was assumed in *Slater*, ADEA-based hostile work environment claims would be governed by the same standards as hostile work environment claims under Title VII.

(unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Id.* at 262 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  When the alleged harasser is a supervisor, vicarious liability is established if the harassment culminates in a tangible employment action.  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2339 (2013).  If no tangible employment action is included in the harassment, vicarious liability is presumed, but can be rebutted if the defendant can show that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided." *Id.*

Plaintiff has offered more than offhand comments and isolated incidents to support his claim of a hostile work environment.  He has testified that Andrews subjected him to ongoing racial slurs and age-related verbal harassment, while also giving him less desirable job tasks and issuing him inferior equipment.  Plaintiff also testified that Andrews' actions consistently interfered with his ability to do his work by frequently interrupting him or undermining his ability to accomplish his job tasks.  While Plaintiff struggled to articulate specific dates for many of his allegations, he consistently maintained that the harassment occurred through the entire time he worked under Andrews' supervision.  Although Plaintiff's allegations are largely uncorroborated by other evidence, Defendant has not rebutted or disputed his account.  In light of the alleged racial slurs and age-related comments, Plaintiff's testimony, if credited, would allow a reasonable factfinder to conclude that he was subjected to a pervasive hostile work environment based on race, age, or both.

Since Andrews was Plaintiff's supervisor, his harassment of Plaintiff – although stopping short of an adverse employment action – would establish Defendant's vicarious liability for a hostile work environment absent evidence that Defendant had reasonable safeguards against

harassment and that Plaintiff failed to take advantage of those safeguards.  Given that Plaintiff

claims that he reported Andrews' conduct to Thomas, a jury could reasonably conclude that

Plaintiff did, in fact, avail himself of Defendant's harassment-reporting protocol.  The disputed

issues of material fact concerning both the nature of Andrews' conduct and whether Plaintiff

reported it to Thomas prevent granting summary judgment on Plaintiff's hostile work

environment claims, and Defendant's motion shall be denied with respect to those claims.

  An order follows.

Dated:  October 31, 2016

         **BY THE COURT:**

         **/s/ Wendy Beetlestone**

         _____

         **WENDY BEETLESTONE, J.**